709 So.2d 1267 (1998)
S.W.
v.
WALKER COUNTY DEPARTMENT OF HUMAN RESOURCES.
2961241.
Court of Civil Appeals of Alabama.
January 30, 1998.
Donald H. Bevill, Jasper, for appellant.
J. Coleman Campbell and Lynn S. Merrill, asst. attys. gen., Department of Human Resources, for appellee.
*1268 MONROE, Judge.
S.W., the alleged father, appeals from the trial court's judgment terminating his parental rights.
The record reflects that R.C. was born on January 22, 1996. At the time of his birth, R.C. tested positive for cocaine and was placed in the custody of the Walker County Department of Human Resources (DHR). The trial court held a hearing and determined that R.C. was dependent and should remain in the custody of DHR. Thereafter, DHR moved to terminate parental rights of the mother and S.W.
The court held a hearing on June 5, 1997, and entered an order on June 12, 1997, terminating the mother's parental rights. The mother did not appeal. On July 15, 1997, the court held a hearing on DHR's request for termination of S.W.'s parental rights. The court then entered an order terminating S.W.'s parental rights. S.W. filed a postjudgment order, which was denied; he timely appealed to this court.
On appeal, S.W. argues that the trial court erred by not awarding his sister custody of the child.
Initially, we note that the trial court's determination was based on evidence presented ore tenus. Thus, its judgment is presumed to be correct and will not be reversed unless it is so unsupported by the evidence as to be plainly and palpably wrong. Thompson v. Department of Human Resources, 574 So.2d 805 (Ala.Civ.App.1990). To terminate parental rights, the court must apply a two-pronged test: (1) The court must determine whether there are grounds for termination of parental rights. These grounds include, but are not limited to, those listed in § 26-18-7, Ala.Code 1975; (2) if the court finds grounds, then the court must inquire whether all viable alternatives to a termination of parental rights have been considered. Ex parte Beasley, 564 So.2d 950 (Ala.1990). In determining whether to deny alternative custody to a relative, the court may consider factors such as age, health, financial condition, and the child's retention in the same environment. B.S. v. Catholic Social Services, 628 So.2d 682 (Ala. Civ.App. 1993). The ultimate consideration in child custody cases is the welfare and best interest of the child. Phillips v. Alabama Department of Pensions and Sec., 394 So.2d 51 (Ala.Civ.App.1981); Hamilton v. State, 410 So.2d 64 (Ala.Civ.App.1982).
When the hearing was held on the petition to terminate S.W.'s parental rights, R.C. was approximately 18 months old. S.W. testified that he had lived with R.C.'s mother for about four months before R.C.'s birth and for about three or four months after his birth. He also testified that he had visited R.C. about five or six times since his birth. He testified that his visits lasted no longer than one hour. At the time of the hearing, he had not seen R.C. in approximately four months. S.W. had paid no child support for R.C., and he had provided him no clothing or other necessities. He testified that he had, however, given R.C. a Christmas present. S.W. has not been proven to be R.C.'s father, because he has refused to take a blood test.
S.W. testified that he wanted R.C. to live with S.W.'s sister, D.M. D.M. testified that she wanted custody of R.C. because her brother wanted her to have custody and because, as she testified, "I have two girls and my tubes are tied and I've always wanted a little boy, but I don't want to go through it myself, so, and he's blood so." D.M. testified that she had visited R.C. about four times, and that her visits lasted about 10 or 15 minutes each. She visited him the four times because she was visiting a friend that lived across the street from the foster parents. During one of these visits, D.M. told the foster parents that R.C. did not look like her family and that she was not sure the child was S.W.'s. A DHR caseworker conducted a home study on D.M. and recommended that R.C. not be placed with her. The caseworker testified that D.M. was a single mother who works 40 hours a week, making $5.77 an hour. D.M. has two young children and, in the caseworker's opinion, caring for three children would be difficult for D.M., because of her limited finances and long work hours. In addition, police reports revealed that D.M. had been physically abused by her estranged husband, from whom she was seeking a divorce. D.M. testified that her husband had *1269 not been physically violent in a while, although he had come to her home and slashed her automobile tires and otherwise harassed her.
The caseworker testified that R.C.'s foster parents, who have had custody of R.C. since he was three days old, have a loving and caring relationship with R.C. and want to adopt him. She also testified that D.M. never expressed an interest in having custody of R.C. until the foster parents began proceedings to adopt him. At the hearing, R.C.'s mother told the trial judge that she wanted him to be cared for and that it appeared to her that the foster parents were taking good care of him.
The testimony does not show that D.M. is a bad person. However, that does not necessarily mean she is a viable alternative, as is contended by the dissent. In this case, the judge was faced with a situation in which an 18-month-old child had been in the custody of two loving and caring foster parents since he was three days old. These foster parents are seeking to adopt the child and raise him as their own. The time the father and aunt have spent visiting the child is negligible at best. The aunt never sought custody on her own, but merely agreed to take the childa child she scarcely even knowsat her brother's request. In explaining her willingness to take the child, the most she could say was that it would be nice to have a son. Yet, the dissent believes the child should be in the custody of the aunt, apparently because she is not a bad person. However, the overriding concern is the best interest and welfare of the child; this court must remember that the future of this now two-year-old child rests with our decision today.
In Judge Crawley's dissent, he relies on T.S. v. J.P., 674 So.2d 535 (Ala.Civ.App.1995); this reliance is totally misplaced. In T.S. the trial court applied the "best interest of the child" standard to terminate parental rights in the course of an adoption action. The trial court had not applied the guidelines for termination of parental rights set forth by statutory and case law. In S.W.'s case, a termination of parental rights case, the trial court did not apply the "best interest of the child" standard. Indeed, the trial court applied the two-pronged test set for in Ex parte Beasley, supra. The trial court did not, in fact, determine whether to place the child with the parents or with the foster parents. All that the trial court did was terminate S.W.'s parental rights, after determining that there were grounds for termination and no viable alternatives. It must be remembered that the retention of the child in the same environment is one factor the trial court may consider in determining whether to terminate parental rights. B.S. v. Catholic Social Services, supra. In our review, we are mindful that the best interest and welfare of the child is paramount in a determination regarding the termination of parental rights. T.S., 674 So.2d at 537. Judge Crawley's statement that the best interest and welfare of the child is not to be considered when determining whether parental rights should be terminated is not supported by law. We must not confuse a situation in which the "best interest of the child" standard is applicable with a situation in which the best interest of the child is one of the factors to be considered by the trial court.
Based on the evidence, we cannot say that the trial court was plainly and palpably wrong in terminating S.W.'s parental rights and in not awarding D.M. custody of R.C. Considering the factors set forth in B.S. v. Catholic Social Services, supra, the trial court properly denied S.W.'s request to award custody to his sister D.M.
Therefore, the judgment of the trial court is due to be affirmed.
AFFIRMED.
ROBERTSON, P.J., and YATES and THOMPSON, JJ., concur.
CRAWLEY, J., dissents.
CRAWLEY, Judge, dissenting.
"The termination of one's parental rights is a solemn matter" because the family relationship deserves the law's utmost protection. T.D.M.V. v. Elmore County Dep't of Human Resources, 586 So.2d 931, 932 (Ala.Civ.App. 1991). "[A] ... decision terminating parental rights is final and irrevocable. Few forms of state action are both so severe and *1270 so irreversible." Santosky v. Kramer, 455 U.S. 745, 759, 102 S.Ct. 1388, 1398, 71 L.Ed.2d 599 (1982) (emphasis in original).
I dissent because I do not believe the evidence presented in this case supports "the last and most extreme disposition permitted by law, the termination of the parental rights of this [father]." Bowman v. State Dep't of Human Resources, 534 So.2d 304, 306 (Ala. Civ.App.1988).
The record does not contain clear and convincing evidence either (1) that there were grounds for termination of the father's rights or (2) that there were no viable alternatives to termination of the father's rights. See Ex parte Beasley, 564 So.2d 950 (Ala. 1990).
DHR presented evidence that the father had not paid any child support and had not visited the son more than 5 or 6 times in his 18-month-long life. The father testified that he did not know he was supposed to pay child support without a blood test confirming paternity and a court order to that effect. That testimony, if believed, indicates ignorance rather than an unwillingness to support his child. The father stated that he wanted his child, that he hoped his sister could help him rear the child, and that he would provide support payments to his sister if the child was placed with her.
Ala.Code 1975, § 26-18-7(a)(6), states that a trial court shall consider whether "reasonable efforts by [DHR] leading toward the rehabilitation of the parents have failed." See Ezekiel v. State Dep't of Human Resources, 562 So.2d 524 (Ala.Civ.App.1990). DHR presented no evidence of what, if any, efforts it had made to provide rehabilitative services to the father. Although a social worker testified that she "met with" the parents to discuss "things that they needed to try and achieve" as well as "programs for them getting the child back," the social worker did not explain what those programs were or detail the goals to be achieved. From that testimony, the trial court could not have concluded either that DHR's efforts were reasonable or that DHR's efforts had failed.
In fact, if DHR made an effort in this case, as it does in most, see, e.g., Perry v. State Dep't of Human Resources, 516 So.2d 659 (Ala.Civ.App.1987), to see that the father located a stable home and employment, then it succeeded, rather than failed. When asked whether she knew of "any bona fide efforts [the parents had] actually made towards bettering themselves or preparing themselves to have this child in their home," the social worker stated, "[N]othing more than seeking employment and a place to live." All parties agreed that the father was employed and had suitable housing.
From the evidence presented at trial, placing the child with D.M., the child's paternal aunt, seems to have been a viable alternative. D.M. is 28 years old, works 40 hours per week at a Wal-Mart store, and has two daughters, ages 3 and 7. At the time of trial, she was separated from her husband and was in the process of divorcing. She receives $400 per month in child support. She testified that she had had a tubal ligation, that she could have no more children, and that she had always wanted a son. She said that she thought she could provide a good home for the child and that her sister, who lived nearby, could tend the child while D.M. was working. She also testified that she had not sought custody of the child earlier on her own because she thought her brother was going to seek custody. When she learned that her brother was not seeking custody himself, but that he wanted her to have custody, she agreed.
The DHR social worker who conducted a home study of D.M.'s home concluded that the house was neat and clean, that D.M. was a good mother to her own children, and that D.M. had a favorable reputation in the community. The social worker expressed some concern about the child's safety because of the abusive nature of D.M.'s husband. D.M. testified, however, that although her husband had hit her once in the past, she had not had any trouble with him for over a year and she did not expect any further trouble from him after the divorce was granted.
Judge Monroe's opinion for the court, which states that "the overriding concern is the best interest and welfare of the child," seems to characterize the trial court's decision in the following terms: placing the child *1271 in the custody of a paternal aunt who is "not a bad person" versus placing the child with "loving and caring foster parents" who have had custody of him since he was three days old. That characterization fundamentally misapprehends the nature of a parental rights termination proceeding.
The first stage of a termination proceeding does not allow a weighing of the child's "best interests." Santosky, 455 U.S. at 759, 102 S.Ct. at 1397-98. In Santosky, the United States Supreme Court explained:
"The [first stage of a parental rights termination proceeding] does not purportand is not intendedto balance the child's interest in a normal family home against the parent's interest in raising the child. Nor does it purport to determine whether the natural parents or the foster parents would provide the better home. Rather, the factfinding hearing pits the State directly against the parents. The State alleges that the natural parents are at fault. The questions disputed and decided are what the State did'made diligent efforts,' and what the natural parents did not do."
455 U.S. at 759-60, 102 S.Ct. at 1397-98. The Court continued:
"However substantial the foster parents' interests may be, they are not implicated directly in the [first] stage [of a termination of parental rights proceeding].... For the foster parents, the State's failure to prove [the grounds for termination of parental rights] may prolong the delay and uncertainty until their foster child is freed for adoption. But for the natural parents, a finding [of the grounds necessary for termination] can cut off forever their rights in their child."
455 U.S. at 761, 102 S.Ct. at 1398-99 (citation omitted). At the first stage of a termination proceeding, the trial court must decide whether there is clear and convincing evidence of the grounds for termination and whether there are viable alternatives to terminationalternatives like placing the child with a relative.
At the first stage in this case, the inquiry should not have been whether it was in the best interest of the child to place him with D.M. or with the foster parents. Instead, the inquiry should have been: whether the grounds for termination, stated in § 26-18-7, had been proved and, if so, whether there was an alternative to termination, such as placing the child with D.M. In T.S. v. J.P., 674 So.2d 535, 538 (Ala.Civ.App.1995), this court held that "best interests" is not the correct inquiry at the first stage of a termination case. Writing for the court, Judge Thigpen explained:
"The mother persuasively argues that the trial court erred in terminating her parental rights without following the applicable provisions of the CPA [Child Protection Act], specifically § 26-18-7, in that it used an improper standard. While the best interest of the child is always a paramount concern in such cases, the trial court erred in applying the `best interest' standard to the question regarding the termination of the mother's parental rights. The termination of parental rights standard provided by the CPA, and the case law interpreting the CPA, should have been applied. Accordingly, the judgment must be reversed and the cause remanded for the trial court to apply the proper standard to reach a decision."
674 So.2d at 538 (emphasis added).
The child's "best interests" come into play only after a decision to terminate parental rights has been made. Thus, the trial court, before it considered the merits of allowing the foster parents to adopt the child, should have determined whether giving D.M. custody of the child was a viable alternative to terminating the father's rights.
I would reverse the trial court's judgment because I think DHR did not establish by clear and convincing evidence that S.W. was unable or unwilling to discharge his responsibilities to his child and because I think placement with D.M. was a viable alternative to termination of S.W.'s parental rights.
"Inasmuch as the termination of parental rights strikes at the very heart of the family unit, a court should terminate parental rights only in the most egregious of circumstances." *1272 Ex parte Beasley, 564 So.2d 950, 952 (Ala. 1990). The circumstances of this case do not present that degree of egregiousness.