YATES, Presiding Judge.
These appeals involve the termination of parental rights of the father, R.W.D., and the mother, K.M.D., as to their three minor children, A.D., C.D., and T.D. The record indicates that the court appointed a guardian ad litem to represent the interests of the children; that the mother and father were both represented by the same attorney in the termination proceeding in *48 volving the minor child, T.D. (JU-99-270); and that the mother and father each had separate attorneys in the termination proceedings involving A.D. and C.D. (JU-98-218 and JU-98-219). We note that although only one termination proceeding was held (on November 7, 2000, for all three children), the trial court did not consolidate the cases at trial and the parties did not seek to consolidate the cases on appeal. After reviewing the separate records, we have concluded that the same ■issues are being presented in both appeals; therefore, we have consolidated the eases for purposes of issuing an opinion.
On April 9, 1998, the Walker County Department of Human Resources (“DHR”) petitioned for temporary custody of A.D. and C.D., alleging that both children were dependent and in need of immediate care, because of serious drug abuse and neglect by the mother and father. After conducting a detention hearing, the court awarded DHR temporary custody of both children. In December 1998, the children were returned to the parents for a trial placement. After repeated reports of drug use and prostitution by the mother, the children were returned to foster care. In May 1999, DHR was informed by the mother that she was pregnant.
On July 16, 1999, DHR petitioned for an emergency pick-up order, alleging that T.D., born on July 15, 1999, had tested positive for cocaine; that the mother had a history of drug abuse; that the child’s two siblings were in DHR custody; and that the child was dependent and in need of emergency care. After conducting a detention hearing, the court entered an order finding that T.D. was dependent and awarding DHR temporary custody. The court further ordered that T.D. be placed in the same foster home as his two siblings; that a home study be completed on J.D. and C.D., a paternal uncle and his wife, to determine the appropriateness of approving their home for a foster-care placement; and if approved, that the uncle and aunt receive physical custody of all three children.
In October 1999, DHR petitioned to terminate parental rights of the mother and father, alleging that the three children remained dependent and in DHR custody because of neglect by the parents and a history of drug addiction by both parents; that the parents had failed two of four drug-screening tests; and that in 1998 the father had been arrested for assault and theft and in 1999 the mother had been arrested for possession of marijuana and the father was arrested for DUI.
On June 12, 2000, the uncle and aunt petitioned for temporary and permanent custody of the three minor children. In August 2000, they petitioned for visitation with the children, alleging that before their temporary relocation to Texas they had been allowed visitation with the children but that they had been denied visitation in the past several months.
After conducting an ore tenus proceeding, the court, on December 15, 2000, entered separate orders terminating the parties’ parental rights as to each child. The court found that A.D. and C.D. continued to be dependent and in need of the care and protection of the court; that the parents had “abandoned” the children (see § 26-18-3, Ala.Code 1975); that the parents had failed to provide for the material needs of the children; and that the uncle and aunt, “even though willing at times, are not suitable as a family resource and are unable to provide the care, custody, support, and protection required by these children.” The mother and father appeal from the termination of their parental rights as to T.D. Only the father appeals from the termination of his parental rights *49 as to A.D. and C.D. In its order pertaining to T.D., the court stated, in part:
“1. That this child was born [in July 1999], and that the said child was placed in foster care and has been under the responsibility of [DHR] for fifteen of the most recent twenty-two months.
“2. That neither of the parents were present at the termination hearing.
“3. The said child tested positive for cocaine at birth, and the mother admitted at that time she had taken cocaine within one week of the birth of the said child.
“4. That the parents have failed to discharge their responsibilities to and for the said child and that the conduct or condition of the parents is such as to render them unable to properly care for this child and that such conduct or condition is unlikely to change in the foreseeable future.
“5. The Court further finds that both the father and the mother are no longer residents of the State of Alabama and that they have been gone from the State of Alabama for approximately one year and that the father has pending criminal charges in Walker County, Alabama.
“6. That the said child was placed in foster care qn or about July 19, 1999, and that the said child is still in foster care.
“7. The Court further finds that the parents have failed to provide for the material needs of this child, have failed to maintain regular visits with the child, and have failed to maintain consistent contact or communication with the said child and that pursuant to [Ala. Code 1975 § ] 26-18-8(1), these parents have abandoned this child and that such abandonment has continued for more than six (6) months.
“8. The Court finds that this child is dependent and in need of the care and protection of the Court.
“9. The Court further finds that the paternal uncle ... and his wife ... are not suitable as a family resource, and are unable to provide for the care, custody, support and protection required by this child and that there are no relatives of said children willing and able to provide the custody, control and care of this child.”
The mother and father argue, among other things, that they were not properly served; that the trial court erred in allowing blood-test results and police reports into evidence; and that the court erred in finding that DHR had met its burden of proving that there were no feasible alternatives to terminating parental rights.
This court has consistently held that the trial court must apply a two-pronged test when a nonparent institutes proceedings seeking the termination of parental rights. See KM. v. Shelby County Dep’t of Human Res., 628 So.2d 812 (Ala.Civ.App.1993). First, the court must determine that the child is dependent, according to clear and convincing evidence. Second, the court must find that there exists no viable alternative to termination of the parent’s custodial rights. J.L. v. State Dep’t of Human Res., 688 So.2d 868, 869 (Ala.Civ.App.1997). Although a child’s parents have a prima facie right to custody, the paramount concern in these proceedings is the best interests of the child. Id.; see also, S.W. v. Walker County Dep’t of Human Res., 709 So.2d 1267 (Ala.Civ.App.1998).
“ ‘The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. The trial court shall *50 consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially.’ ”
A.R.E. v. E.S.W., 702 So.2d 138, 139 (Ala.Civ.App.1997) (quoting M.H.S. v. State Dep’t of Human Res., 636 So.2d 419, 421 (Ala.Civ.App.1994)) (citations omitted).
In October 2000, DHR submitted a report to the court, stating, in part:
“[The father] and [mother] have been known to the agency since February of 1997 after a report was made on behalf of [A.D.] of inadequate supervision. There was another report of inadequate supervision made in January of 1998. At that time [the mother] was about six months pregnant with [C.D.]. This report was marked as non-indicated because there was not enough information to substantiate an indicated report. On April 7, 1998, there was another report made of neglect on behalf of [A.D. and C.D.]. This report is what resulted in the two children being placed in foster care. This report was indicated for inadequate shelter, inadequate clothing, and inadequate personal hygiene. Throughout the agency’s investigation process for all the reports there has been concern of drug use by the parents.
“Once the children were placed into foster care there was still concern about
possible drug use by the birth parents. As stated in several Individualized Service Plans [TSPs’] the birth parents will have random drug screenings from ‘NWMH’. [The mother and father] had 4 drug tests. Two of these tests were positive for marijuana (2nd and last tests). They were also supposed to report to Court Referral for color coding drug screenings.
[[Image here]]
“[A.D. and C.D.] were returned to their parents on December 22, 1998. It was on this date that the birth parents informed me that they had moved into their new home.
[[Image here]]
“In February the agency started to receive reports on [A.D. and C.D.]. These reports were made with a period of time between the two. One report was an anonymous call on Intake making reports of drug use and prostitution. The second report was made at the agency. This informer was also making the same reports of drug use and prostitution. This reporter also informed me that they were offered [the mother’s] sexual services in lieu of money owed.... On March 15, 1999, there was an emergency hearing on the behalf of the birth parents. The children remained in foster care due to parents not continuing [A.D.’s] Infant Enrichment. It was also discussed about the parents going on color-coding once again to ensure that the parents are not using drugs.
[[Image here]]
“On May 11, 1999, there was another ISP that was held with the birth parents. It was explained to the birth parents that at this time the agency did not believe the children could be placed back in their care. However, if they had relatives that they wanted us to consider *51 please give us their name, address and telephone number. It was also in this meeting that [the mother] disclosed that she was six months pregnant with her third child. [The mother] also explained that she was planning on signing over her rights to a relative because she did not want us to remove the child from them.
“On July 1, 1999, there was another ISP held for this case due to the impending birth of the third child. The parents were once again invited to come, however, they did not show up for this meeting. On July 12, 1999, the agency set up visits with the birth family because at that time a Termination of Parental Rights petition had not been filed. [During that month, the. mother] gave birth to [T.D.]. The child was tested for drugs due to the mother’s history. [The child] tested positive for cocaine at birth. At this time there was a CA/N [child-abuse/neglect] investigation initiated on behalf of [the child]. It was found to be indicated for substance misuse. During the course of the interview [DHR] talked to [the father] concerning [the child’s] well-being. He stated that he knew [the mother] was using [illegal drugs; however, he said,] he could not make her stop. [The father] also stated that he smokes marijuana on a regular basis because of the problems he had been having since becoming involved with the agency. There was a detention hearing on July 19, 1999, on behalf of [the child]. At this hearing parents’ attorney asked the agency to complete a home study on [the paternal uncle and aunt]. This home study was completed on July 21, 1999. It was at this meeting it was determined that visitation would continue. However, these visits would be with [the uncle and aunt]. At this time, the agency was no longer working with the parents because of their history and [the child] being born addicted to cocaine. Also at this meeting the worker explained to [the uncle and aunt] that the agency had concerns with their home study.
“[The uncle and aunt] continued to visit until October 4, 1999. At that time the agency was excused from making reasonable efforts because we were pursuing a Termination of Parental Rights. However, before the court hearing the visits were not consistent. The relatives only visited approximately four times.
“RELATIVE RESOURCES:
“The agency conducted a home study of [the uncle and aunt]. The . home study proved to be unfavorable for several reasons: lack of adequate room, possible financial strain, and children’s safety. The children’s safety is questioned because it is unknown how much contact the birth parents will have with the relatives. The main caretaker during [the] day for the children will be [the paternal grandmother], [She] made it known in the July 27, 1999, ISP that she saw no harm in [the mother and father] visiting the children whenever they wanted to. The agency would have to question whether or not she could stop [the mother and father] from removing the children from her at any given time. The agency has experienced firsthand how emotional [the father] can become when he is upset. The agency does not believe that [the grandmother] could protect the children from [the father] if he were to become angry.
“[The mother] also gave a list of relatives that she wanted to be considered as possible placements for the children. After a background check it was proven that all the relatives had a history with the Texas equivalent of DHR and the Abilene, Texas, police department. Their history with the DHR consisted of
*52 adult protective services to reason to believe of physical abuse [sic]. The relatives’ history with the police range from assault, theft, sexual assault and burglary.
“CURRENT SITUATION:
“On December 9, 1999, [DHR] went to [the uncle and aunt’s] home in [an] attempt to locate [the mother and father] due to their current address not being valid. [The mother] was there and informed [DHR] that [the uncle and aunt] had moved back to Texas because of an illness in [the aunt’s] family a while back and that [the mother and father] were currently living with [the paternal grandmother]. However, the agency had not been informed of any change in location or circumstances with the [paternal relatives].
“In January of 2000, [DHR] went to the home of [the paternal grandmother] to locate [the mother and father] because juvenile court was in the process of trying to serve them with the TPR petition. It was at this time the worker found out from a neighbor that [the mother and father] had moved to Texas with [the uncle and aunt].
“As of March 14, 2000, [the uncle and aunt] were still living in Texas. At this time I had received a call from ’ [the uncle] with his current number and address. [The father] was supposedly in jail in Abilene, Texas and [the mother’s] whereabouts were unknown.
“As of March 20, 2000, [the uncle and aunt] have moved back to Jasper, Alabama.
“On March 23, 2000, there was a Termination of Parental Rights hearing held. At this time the hearing was continued until a later date due to incorrect service notification for the parents. [The uncle and aunt] were at the hearing. At this time they still wanted custody of all three children.
“On September 13, 2000, [DHR] was notified by ... the DHR equivalent in Abilene, Texas, that [the mother] had her fourth child. The child and [the mother] both tested positive for alcohol. [The Texas DHR] said they could not remove the child but the case would go to Ongoing Services.
“On October 2, 2000, [Texas DHR] contacted [Alabama DHR] again to say that the baby had been picked up over the weekend. [The mother and father] were both arrested on forgery and [the mother] was already on probation at the time for theft of a building and theft of an automobile. [Texas DHR] went to court on October 5, 2000, and [the mother and father] did not appear. Someone had to call and wake them up but they were an hour late. [The mother] tested positive for THC, opiates, and muscle relaxers, which was a violation of her probation. [Texas DHR] was under the impression that [the mother] was going to jail. There were no suitable relatives found for this baby.
“Since the hearing there has only been one contact made by the family. This contact was a phone call from [the paternal grandmother] to inform me that the parents were in jail in Texas.
“RECOMMENDATION:
“The Walker County DHR continues to recommend that birth parents’ rights be terminated. This would allow the State to obtain permanent custody with the purpose of adoption. The agency could not recommend the relatives due to possible instability and possible lack of protection for the children. Also the agency has to question the commitment of the relatives. They did not become involved with the case until [T.D.] was born in July of 1999. At that time [A.D. *53 and C.D.] had already been in care for 15 months. When the relatives were questioned why they did not become involved with the case earlier, they stated that they did not know who to get in contact with. However, this was not the case when [T.D.] was born. [The uncle and aunt] came to the agency and requested to speak to the current worker (hence their involvement in the case at that time).
“The children are currently together in a safe, secure, and loving environment. The Walker County DHR feels that the foster home is the best possible placement for the children and the foster parents are prepared to offer permanency for them.”
The first issue is whether the trial court erred in determining that the parents had been properly served and that it therefore could proceed with the termination hearing. The trial court noted that the parents were not present at the hearing; that they were both represented by counsel; and that the record contained a “return of service receipt” signed by the father. Although the initial record did not contain a copy of the registered-mail receipts, the supplemental record on appeal contains several registered- and certified-mail receipts signed by the mother and father, addressed to their relatives’ address in Texas and dated in June and November 2000. In addition, the record contains an answer by the mother and father, dated October 13, 2000, to the petition to terminate parental rights as to T.D. We, therefore, conclude, based on the evidence presented in this case, that the court did not err in determining that both parents had been properly notified of the termination proceedings. J.C. v. AGAPE of Cent. Alabama, 590 So.2d 302 (Ala.Civ.App.1991).
Next, the parents argue that the trial court erred in admitting into evidence the results of T.D.’s blood test and their own police reports. Although we do not provide a detailed recitation of the evidence, it appears that the trial court had ample evidence to conclude that it was in the children’s best interests to terminate the parents’ parental rights. Kim Holder, the DHR social worker initially assigned to the case, testified as to the information contained in the confidential reports to the court. She provided a detailed case history, including the agency’s interaction with the parents since 1997, the parents’ history of drug abuse, T.D.’s testing positive for cocaine at birth, and efforts by the agency toward reunification between 1997 and 1999 and relative placement after 1999. We conclude that any consideration of the additional medical or police reports admitted into evidence was harmless error, based on the corroborating testimony by the DHR social worker. R.M. v. State Dep’t of Human Res., 735 So.2d 1218 (Ala.Civ.App.1998); Franklin v. State Dep’t of Human Res., 513 So.2d 625 (Ala.Civ.App. 1987).
Last, we note that the aunt testified during the proceeding that she preferred that the children be adopted by the foster family, because, she said, she did not “want to cause any emotional damage” to them. She stated, in part:
“[The foster parents] had them for a year, they haven’t seen us for over a year and I’m not gonna cause no — -I don’t want to cause no damage pulling them out.... I would like for them to stay with the [foster parents] because I would just like to see them and since my house caught on fire the other morning, I don’t want to bring no other children in.”
The aunt further testified that if she could obtain the children through a gradual pro *54 cess then she would reconsider taking the children and that at the time of the proceeding she preferred to visit with the children. The uncle stated that he was currently unemployed; that he was completing truck-driving school; and that he thought he could adequately provide for the entire family, which included his own two children, his wife, his mother, and the brother’s three children.
This court has historically given great deference to the discretion of the trial court, which is in the best position to observe witnesses and hear their testimony. After thoroughly reviewing the record, we conclude that the court did not err in terminating the mother and father’s parental rights. A.H. v. State Dep’t of Human Res., 763 So.2d 968 (Ala.Civ.App.2000).
AFFIRMED.
CRAWLEY, THOMPSON, PITTMAN, and MURDOCK, JJ., concur.