YATES, Presiding Judge.
The opinion of April 20, 2001, issued in Case No. 2000032, is withdrawn, and the following is substituted.
This appeal arises out of a case involving the termination of parental rights of the mother, T.K., and the father, A.L., as to their minor child. The mother and father appeal.
In March 1999, the Tuscaloosa County Department of ' Human Resources (“DHR”) petitioned the juvenile court for temporary custody of the child. DHR alleged that the 15-year-old mother had run away with the child; that the mother and child were both dependent and in need of care and protection by the state. In May 2000, DHR moved for permission to filé a petition to terminate parental rights of the mother and the alleged father. DHR alleged that the child continued to be dependent; that the parents were unwilling or unable to discharge their parental responsibilities and that their conduct or condition was unlikely to change in the foreseeable future; that reasonable efforts at reunification had failed; that there were no viable alternatives to termination of. parental rights; and that it would be in the child’s best interests to terminate the mother and alleged father’s parental rights. The court granted the motion on May 15, 2000, and scheduled a termination hearing.
*688 After conducting an ore tenus proceeding, the court, on October 4, 2000, entered an order determining that A.L. was the father of the child and terminating the mother and father’s parental rights.[1] The order stated, in part:
“The court acknowledges that a natural parent has a prima facie right to the custody of her/his child, unless it can be proven by clear and convincing evidence that permanent removal of the child from the parents’ custody would serve the best interests of the child. The Court further acknowledges that the termination of a person’s parental rights is an extreme matter that is not considered lightly. However, the paramount concern of this Court is the consideration of the child’s best interests. In determining what is in the child’s best interest, the court has considered whether the parents are physically, financially and mentally able to provide for the child.
[[Image here]]
“1. That [T.K.] is the mother of said child. That [A.L.] is the father of said child.
“2. Service of process was perfected upon the mother and father in accordance with applicable law.
[[Image here]]
“4. That said child is dependent as defined by statute; and the facts alleged in the petition filed in this case are determined to be true.
“5. That the conduct and condition of the mother ’and father is such as to render them unable to properly care for said child and that such conduct or condition is unlikely to change in the foreseeable future.
“6. That the mother and father have failed to provide for the material needs of said child or to pay a reasonable portion of his support.
“7. That DHR has made reasonable efforts to contact the mother and father to attempt to rehabilitate and train them in order to reunify the family, but these efforts have been unsuccessful and would likely be unsuccessful if continued.
“8. That there is no suitable relative of said child with whom the child could be placed.
“9. All viable alternatives to a termination of parental rights have been considered and no such alternative exists.
“10. That the Court has considered the well-reasoned recommendation of the child’s [guardian ad litem] in which she recommends that parental rights should be terminated.”
The mother and father argue on appeal that the trial court erred in determining that there were no viable alternatives to terminating their parental rights. We disagree. This court has consistently held that the trial court must apply a two-pronged test when a nonparent institutes proceedings seeking the termination of parental rights. See K.M. v. Shelby County Dep’t of Human Res., 628 So.2d 812 (Ala.Civ.App.1993). First, the court must determine that the child is dependent, according to clear and convincing evidence. Second, the court must find that there exists no viable alternative to termination of the parent’s custodial rights. J.L. v. State Dep’t of Human Res., 688 So.2d 868, *689 869 (Ala.Civ.App.1997). Although a child’s parents have a prima facie right to custody, the paramount concern in these proceedings is the best interests of the child. Id.; see also, S.W. v. Walker County Dep’t of Human Res., 709 So.2d 1267 (Ala.Civ.App.1998).
“ ‘The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed.. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially.’ ”
A.R.E. v. E.S.W., 702 So.2d 138, 139 (Ala.Civ.App.1997) (quoting M.H.S. v. State Dep’t of Human Res., 636 So.2d 419, 421 (Ala.Civ.App.1994) (citations omitted)).
In January 2000, DHR submitted a report to the court, stating, in part:
“[The child] and his mother, [T.K.], were placed in the custody of the Tuscaloosa County Department of Human Resources on March 25, 1999. [The mother] was 15 at the time and had run away with [the child]. She did not take any food or diapers with her. When [the mother] was picked up, [the child] was sickly and required medical attention.
“After being placed in foster care, [the mother] ran away again. A pick-up order was filed and [the mother] was charged with contempt of court. [The mother] was placed in the custody of her father, [T.B.]. A consent decree on this date also ordered that [the mother], among other requirements, attend counseling, cooperate with her custodians/parents, attend school daily, keep appointments with DHR, and notify DHR of any changes of address, telephone, living arrangements, or school status....
“An Individualized Service Plan (ISP) team meeting was held on July 9, 1999. [The mother] and her father both participated. [The mother] agreed to adhere to the rules of the consent decree and to supervised visits with [the child] one time per week. The visits were scheduled to last two hours and be supervised by [the mother’s] paternal grandmother, [L.B.]. According to [the foster mother], [the mother] had not visited with [the child] since before Labor Day Weekend of 1999.
“When [a] DHR worker attempted to contact [the mother] and [her father] in September 1999 regarding [the mother’s] visiting with [the child], [her father] informed the worker that [the mother] had not been in his home since the previous Friday. [Her father] stated that someone from the school told him that [the mother] had not been going to school. [Her father] stated that someone from the school told him that since [the mother] had turned 16, she was not legally required to attend school. [Her father] stated that he and [the mother] had a disagreement regarding her not attending school and not wanting to work either.
“Current Situation:
“[The child] has recently celebrated his first birthday. He continues to be in *690 the [foster mother’s home], [The child] came to [the foster mother] with developmental delays but at a recent checkup, the physician has stated that he is catching up on his developmental milestones. There are still concerns about [his] not using double-syllable sounds (“ma ma,” “da da,” etc.), which could be related to hearing problems. He will be rechecked at 15 months of age.
“[The mother] continues to be on the run. She' has not contacted DHR or [the foster mother] since October 1999. Her whereabouts are unknown. [Her father] has not been in contact with DHR and it is unclear if he has had contact with [the mother]. He has [the foster mother’s] telephone number but has not made any effort to contact her to visit with his grandson.
“[The foster mother] has reported to the DHR worker that over the Christmas holidays, [A.L.] (the alleged father) contacted her to request a visit with [the child], [The foster mother] instructed [the father] to contact the DHR worker to arrange visits. The worker has not received any .calls from [the father]. Also, [the father] gave his mother’s name and phone number to [the foster mother], [She] has passed on that information to DHR. DHR has made several attempts to contact [the paternal grandmother] but has only been able to reach her answering machine. [The paternal grandmother] returned messages to the worker and left her mailing address (stated above' for the alleged father’s address). On Tuesday, January 25, 2000, the worker left a message for [the paternal grandmother] to inform [the father] of the permanency hearing being held today.
“Recommendations:
“The Tuscaloosa County DHR has attempted to work with [the mother] and to support her in order for her to regain the custody of her son. She has made little effort to change her situation. Although her father has knowledge of [the child’s] situation, he has also made little effort to provide a home for the child. [The maternal grandmother’s] whereabouts are unknown (a news report in September 1999 listed her as one of the women arrested for solicitation in a police sting and all correspondence from DHR has been returned stamped ‘No Such Number’). As she has an open case at DHR, she would not be a resource. The alleged father knows how to contact the DHR worker but has not to this date. DHR has attempted reasonable efforts to reunite the child with his family and there are no other viable resources. The child has spent the majority of his life in foster care and needs a permanent placement. Therefore, DHR recommends that the case plan be changed to ‘Termination of Parental Rights and Adoption.’ ”
In June 2000, DHR submitted a “Judicial Review Report” to the court, which stated, in part:
“This child was placed in the custody of DHR on 3-25-99 due to the mother’s being unable to care for him. [The mother] was also placed in DHR custody and had been on the run with [the child]. When she was picked up, [the child] was sick, had no diapers, and no food. [The mother] was later placed in the custody of her father. Supervised visits were arranged between the foster mother and [the mother]. However, [the mother] has not seen the child since August of 1999. [The mother] had runaway again. She was finally picked up on March 31, 2000, on charges of ‘Carrying a Concealed Weapon.’ She was placed in detention and later released to her father’s custody. [The mother] was pregnant with her second child at the time. On *691 June 4, 2000, she gave birth to her daughter, two months premature. [The mother] informed the Druid City Hospital Social Worker, Amy Latham, that she was in the.custody of her father but had been living with her mother, [L.K.]. This is neither a safe place for ■ [the mother] nor her children. [The foster mother] has given [the child] a stable, safe, and loving home. [The mother] has not changed her living situation, even with the assistance of her paternal family or DHR, to warrant regaining custody of her son.
“The case plan -for [the child] is ‘Termination of Parental Rights and Adoption.’ [The mother] has made no attempts to better her situation. The alleged father, [A.L.], has been in and out of jail and has not contacted DHR even after written correspondence informing him of DHR’s plans to terminate all parental rights. [The mother’s] paternal family has not contacted DHR or the foster mother in regard to getting visits with [the child] or attempting relative placement. [The mother’s father] has not shown that he is able to care for [the mother] and keep her in his physical custody to demonstrate his ability to provide an appropriate home for [the child].
“No progress has been made toward alleviating the circumstances necessitating placement. [The mother] continues to place herself in dangerous and unstable situations. Her lifestyle mimics that of her mother’s. She does not understand that her lifestyle is not safe for a child.”
The mother, who was 17 .years old at the time of the hearing, testified that she had not seen the child in 8 or 10 months; that she did not have a reason for not visiting the child; and that she had not provided the child any support. She stated that she had been living in different places to avoid being placed in DHR custody. She testified that she had no family members who could provide a placement for the child; however, she said she thought that a friend or the child’s paternal grandmother might be willing to provide a placement for the child.
The father, 21 years old at the time of the hearing, testified that he had dated the mother for three years; that they had lived together in his aunt’s home for about 1 1/2 years before she became pregnant; that he acknowledged the child as his own; and that he had provided for the child for the first three months after the child was born. He stated that he had visited with the child approximately three times since the child had been placed in DHR custody. The father was currently in the county jail for violating the terms of his sentence under the Drug Court Program. He stated that he had been arrested for harassment and domestic violence based on incidents involving the mother of his oldest child.[2] The father admitted that he had been involved in selling drugs prior to his arrest and placement in the Drug Court Program. When questioned about his lack of support and his sporadic visits with the child, he stated that he was “too busy doing around, going on the streets” to arrange visits with the child.
The current DHR social worker, Ginger Collins, testified that she had considered all relative resources provided by the mother and father. She stated that the maternal grandmother had an open “protective-service” case with DHR and therefore would not be an appropriate placement; that the paternal grandfather had *692 failed to provide an adequate placement for the mother when she was placed in his custody and had failed to express any interest in his grandchild; and that she had been unable to contact an aunt that the mother had recommended for placement. She further stated that she had spoken with the paternal grandmother regarding a relative placement; however, according to Ms. Collins, the grandmother was not interested in taking the child.[3] She also stated that neither parent “had adjusted their circumstances to meet the safety needs of the child.”
This court has historically given great deference to the discretion of the trial court, which is in the best position to observe witnesses and hear their testimony. After thoroughly reviewing the record, we conclude that the record contains ample evidence from which the trial court could properly conclude that it was in the best interests of the child to terminate the mother and father’s parental rights. A.H. v. State Dep’t of Human Res., 763 So.2d 968 (Ala.Civ.App.2000).
OPINION OF APRIL 20, 2001, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING OVERRULED; AFFIRMED.
AFFIRMED.
THOMPSON and PITTMAN, JJ., concur.
CRAWLEY and MURDOCK, JJ., dissent.

. On January 29, 2001, the juvenile court determined that the court clerk had failed to enter its final order and amended final order, dated October 4, 2000, and October 16, 2000, as required by Rule 58, Ala. R. Civ. P. The court ordered that the clerk enter the orders terminating the mother and father’s parental rights immediately; the order was entered on January 30, 2001.

. The father has three children; the two younger children are from his relationship with T.K., and the older child, a three-year-old, is from a prior relationship.

. The parties' second child was born on June 4, 2000, and that child was also placed in DHR custody; according to the DHR caseworker, the paternal grandmother expressed an interest in being a placement for that child.