777 So.2d 706 (1999)
G.L.C.
v.
STATE DEPARTMENT OF HUMAN RESOURCES.
2971032.
Court of Civil Appeals of Alabama.
March 5, 1999.
Rehearing Denied December 3, 1999.
Certiorari Quashed August 18, 2000.
*707 C. Blake West, Cullman, for appellant.
J. Coleman Campbell and Lynn S. Merrill, asst. attys. gen., Department of Human Resources, for appellee.
Alabama Supreme Court (1990511).
YATES, Judge.
This case involves the termination of parental rights of the father, G.L.C., as to his minor child. The Cullman County Department of Human Resources ("DHR") petitioned the court for permanent custody of the child on November 6, 1997, and requested the court to terminate the parental rights of the mother and father. The petition alleged that the father was in prison; that the mother had relinquished her parental rights; that the child had been in DHR's custody since August 1994, shortly after the child's birth; and that both parents had been neglectful and abusive toward the child. Also on November 6, DHR submitted to the court a confidential report, which identified both the mother and father as being dysfunctional, with histories of alcohol and drug abuse, and as having a history of marital discord and domestic violence. The report also stated that the father has an extensive criminal history. The mother voluntarily relinquished her parental rights before trial, and she is not a party to this appeal.
On January 29, 1998, the court granted the father a hearing in response to the father's pro se answer filed in December 1997 requesting that he be considered as a fit and proper person to care for his child, or, in the alternative, that the court consider relatives who could care for the child until the father's release from prison.
Following ore tenus proceedings, the court, on May 15, 1998, terminated the father's parental rights, stating:
"3. [G.L.C.], father of the minor child, is a prisoner of the State of Alabama and is presently serving time for forged instrument charges. [G.L.C.], has previously served jail time for manslaughter.
"4. There is a history of domestic violence between [G.L.C. and the mother], parents of the minor child. [The mother's] first contact with [DHR] was in August of 1994 while she was at Harbor House because of domestic violence.
"5. [G.L.C.], father of minor child, has a history of drug and alcohol use.
"6. [G.L.C.], father of minor child, has not seen the minor child since September 1996.
"7. [DHR] has exhausted all reasonable alternatives available as alternatives to termination of parental rights.
"8. [DHR] has explored relative resources and the Court finds that there are no relative resources which are appropriate for the child for either temporary or permanent placement."
The father raises several issues on appeal: (1) whether the trial court erred in allowing testimony over hearsay objections; (2) whether § 26-18-7(a)(4), Ala. Code 1975, is unconstitutional in that it imposes two punishments upon a person for a single crime, or in that an accused is not informed of the full effect of a guilty plea; (3), (4), and (5) whether DHR met its *708 burden regarding viable alternatives to termination; and (6) whether the trial court erred in admitting into evidence a "Confidential Report" submitted by DHR.
As to the first and last issue, we will consider these jointly because they both relate to oral and written evidence presented at trial. This court has held that hearsay testimony and written reports are admissible as evidence under § 12-15-65(h), Ala.Code 1975 (Cum.Supp.1998), when a child has been previously declared dependent. That section provides:
"(h) In disposition hearings all relevant and material evidence helpful in determining the questions presented, including oral and written reports, may be received by the court and may be relied upon to the extent of its probative value, even though not competent in a hearing on the petition. The parties or their counsel shall be afforded an opportunity to examine and controvert written reports so received and to cross-examine individuals making reports."
(Formerly § 12-15-65(g)).
This court has consistently held that in-court testimony that corroborates, and in many instances duplicates, the information contained in written reports is not a violation of the hearsay rule. Here, the father was afforded the opportunity to cross-examine witnesses and to controvert any written evidence submitted. Further, based on the cumulative evidence presented, this court finds that any possible error was harmless. See J.L. v. State Dep't of Human Resources, 688 So.2d 868 (Ala.Civ. App.1997) (citing J.V. v. State Dep't of Human Resources, 656 So.2d 1234, 1237 (Ala.Civ.App.1995)); and T.W.W. v. Lauderdale County Dep't of Human Resources, 628 So.2d 761, 762 (Ala.Civ.App.1993).
As to the second issue, we find no authority to support the father's claim that § 26-18-7(a)(4), Ala.Code 1975, is unconstitutional. The termination of parental rights is a civil matter, not a criminal or quasi-criminal matter, and, therefore, the father's argument regarding double jeopardy is inapplicable. Any "conviction of and imprisonment for a felony" is clearly within the grounds a court may consider in terminating parental rights. Ex parte Beasley, 564 So.2d 950, 952 (Ala. 1990) (citing § 26-18-7, Ala.Code 1975). The record reveals that the father had an extensive criminal history, which included convictions for manslaughter and drug possession, and, at the time of trial imprisonment on forged-instrument charges. The court is allowed to consider all factors that weigh on a parent's ability to discharge his or her parental responsibilities. Id.
The remaining issues relate to DHR's burden of proving by clear and convincing evidence that there were no viable alternatives to terminating the father's parental rights. To terminate the parental rights upon the State's petition, a court must make several findings. First, the court must determine that the child is dependent, according to clear and convincing evidence. Second, the court must find that there exist no viable alternatives to termination of the parent's custodial rights. J.L., 688 So.2d 868. Although a child's parents have a prima facie right to custody, the paramount concern in these proceedings is the best interest of the child. Id., at 869. When ore tenus evidence is presented in a case involving the termination of parental rights, the judgment of the trial court based on that evidence is presumed correct and will be set aside only if the record shows the judgment to be plainly and palpably wrong. L.A.G. v. State Dep't of Human Resources, 681 So.2d 596, 598 (Ala.Civ.App.1996).
Reciting all of the facts in this case would serve no useful purpose. The record indicates that relative resources were investigated and that none were found to be willing and able to care for the child. We note that although there was conflicting testimony regarding the child's paternal aunt's prior willingness to taking *709 him, the aunt testified that she did not want the child unless a DNA test was completed that proved that G.L.C. was the child's father; that she would either keep the child permanently or until her brother became able to care for the child; that she had not visited the child since his birth; and that she had previously indicated to DHR that because of financial considerations and her concern for the child's safety, she would not take the child. Regarding disputed testimony, this court has stated: "When a trial court hears disputed ore tenus evidence, its judgment based on that evidence will not be set aside unless it is so contrary to the evidence as to be plainly and palpably wrong." D.G. v. Calhoun County Dep't of Human Resources, 680 So.2d 359, 360 (Ala.Civ.App.1996) (citing Fortenberry v. Alabama Dep't of Pensions & Security, 479 So.2d 54 (Ala.Civ. App.1985)).
We accept the court's determination that DHR met its burden of proving the inability of the father to provide a safe and stable environment for the child and proving that there were no viable alternatives to the termination of the father's parental rights. We further accept the court's determination that DHR considered relative resources and found that there were none that were appropriate for temporary or permanent placement; therefore, the evidence warranted the termination of the father's parental rights.
AFFIRMED.
ROBERTSON, P.J., and MONROE and THOMPSON, JJ., concur.
CRAWLEY, J., dissents.
CRAWLEY, Judge, dissenting.
I dissent, because I do not believe the evidence presented in this case supports "the last and most extreme disposition permitted by law, the termination of the parental rights of this [father]." Bowman v. State Dep't of Human Resources, 534 So.2d 304, 306 (Ala.Civ.App.1988).
The child at issue in this case is a developmentally-delayed four-year-old boy with a heart condition who has been in the same foster home since he was seven weeks old. G.L.C., the child's father, is in prison; he expects to be released within two years. The record indicates that there is a viable alternative to termination of the father's rights, namely: placing the child in the custody of D.A., the child's paternal aunt.
D.A. is married, has two children, ages five and eight, and lives in a three-bed-room, two-bath home. She and her husband are both employed. D.A.'s husband works for Alabama Power Company. D.A. works with trainable mentally retarded children. She testified that she had had "a lot of exposure to developmentally delayed children," and that she "would be ... able to help [her brother's child] succeed and do more things because [she had] been trained in that field [special education] as a professional." In addition, D.A. said that her husband was deaf and that her children communicate with him by signing, "[s]o any kind of handicap is not a problem for [them]." D.A. testified that, if she were to obtain custody of the child, she would try to enroll him in what she referred to as "a wonderful preschool program" at a special-education center where she had previously worked.
The DHR social worker who first interviewed D.A. about being a possible placement alternative for the child testified that D.A. was not interested in being anything other than a visiting relative resource. According to the social worker, D.A. inquired whether DHR would provide any financial help for the child's day care expenses and, when D.A. was told that DHR provided no such help, D.A. said she and her husband were not interested in taking the child.
D.A. testified that she did first express an interest in being a visiting relative for G.L.C.'s child. However, she explained that she would have liked to visit with the boy to see how they adapted to each other before agreeing to a more permanent arrangement. *710 D.A. gave her opinion that the social worker "actively discouraged" her from seeking custody of G.L.C.'s child. D.A. said that the social worker not only stated that DHR would provide no help with day care expenses, but also emphasized the cost and difficulty of looking after a developmentally delayed child with heart problems. D.A. stated that, at the time she spoke to the social worker, she (D.A.) had two children of her own in day care, with childcare expenses of over $500 per month. She testified that she and her husband wanted to take G.L.C.'s child, but had decided that, without financial help, they could not afford three children in day care. D.A. explained that, with or without financial help from DHR, she was then (at the time of trial) able to afford day care expenses for her brother's child because her own children were in school and did not need day care.
When D.A. was asked whether she had an opinion about "whether ... [the child] might be traumatized if he were suddenly taken away from the only family he [had] known for the last four years," D.A. responded:
"That's the reason I asked if we could try him coming [to visit] on the weekends to see how he [was] going to react and how he [was] going to adjust to our family.... I really don't know how he would react. You know, I don't know what to say. I don't know if it would traumatize him. We would love him and give him all the love he needed, and if he needed counseling, we would be happy to take him to counseling and, you know anything that we needed to do to take care of him and to help him adjust to coming to our home. We have a very loving family, and we're very patient."
When DHR's attorney asked D.A. whether she thought the child deserve[d] a "permanent placement home, a safe environment with a safe family after four years of living in limbo," D.A. answered:
"Yes, he does. And he could have had that with me if I'd had some support from DHR. That's the whole purpose of DHR is to put them with their family. And if I'd had some help or support there instead of negative comments like [the child] has this, this, this."
D.A. acknowledged that she had previously expressed some doubt about whether her brother was the father of the child. She testified, "[J]ust to be sure, we would request DNA testing." She added, "If he is our blood relative, he should be with his family." The parties stipulated that G.L.C. and the child's mother had a common-law marriage at the time of conception. The trial court decided that, because G.L.C. was the presumed father, "there will be no DNA testing performed."
At the close of all the testimony, the guardian ad litem stated:
"I will say that from the testimony that I heard, that I believe [D.A.] is a good seems to be a good resource. I didn't hear anything to the contrary about that. However, I feel that at this late date, the child having been in the same foster family ... since infancy, that it would be in the best interest of the child to terminate parental rights and for that child to remain in the home and with the parents that the child has always known."
"The termination of one's parental rights is a solemn matter that deserves the law's utmost protection." T.D.M.V. v. Elmore County Dep't of Human Resources, 586 So.2d 931, 932 (Ala.Civ.App.1991). My review of this record convinces me that DHR did not treat these proceedings with the solemnity that the law requires. It appears that, in its understandable eagerness to have the child adopted by his foster family, DHR disregarded the paternal aunt as a possible placement alternative and dissuaded her from seeking custody. I cannot condone such strategies, and I must dissent from this court's implicit approval of them. "[A] ... decision terminating parental rights is final and irrevocable. Few forms of state action are both so severe and so irreversible." Santosky *711 v. Kramer, 455 U.S. 745, 759, 102 S.Ct. 1388, 1398, 71 L.Ed.2d 599 (1982) (emphasis in original).
The guardian ad litem stated that the paternal aunt was "a good resource," but that it would be in the best interest of the child to remain with his foster family. Characterizing the issue as whether to place the child with the aunt or with the foster family fundamentally misstates the nature of a parental-rights-termination proceeding. I repeat what I said in my dissent in S.W. v. Walker County Dep't of Human Resources, 709 So.2d 1267, 1271-72 (Ala.Civ.App.1998) (Crawley, J., dissenting):
"The first stage of a termination proceeding does not allow a weighing of the child's `best interests.' Santosky v. Kramer, 455 U.S. at 759, 102 S.Ct. at 1398, 71 L.Ed.2d 599. In Santosky, the United States Supreme Court explained:
"`The [first stage of a parental rights termination proceeding] does not purport and is not intendedto balance the child's interest in a normal family home against the parent's interest in raising the child. Nor does it purport to determine whether the natural parents or the foster parents would provide the better home. Rather, the factfinding hearing pits the State directly against the parents. The State alleges that the natural parents are at fault. The questions disputed and decided are what the State did'made diligent efforts,'and what the natural parents did not do.'
"455 U.S. at 759-60, 102 S.Ct. at 1398, 71 L.Ed.2d 599. The Court continued:
"`However substantial the foster parents' interests may be, they are not implicated directly in the [first] stage [of a termination of parental rights proceeding].... For the foster parents, the State's failure to prove [the grounds for termination of parental rights] may prolong the delay and uncertainty until their foster child is freed for adoption. But for the natural parents, a finding [of the grounds necessary for termination] can cut off forever their rights in their child.'
"455 U.S. at 761, 102 S.Ct. at 1399, 71 L.Ed.2d 599 (citation omitted). At the first stage of a termination proceeding, the trial court must decide whether there is clear and convincing evidence of the grounds for termination and whether there are viable alternatives to termination alternatives like placing the child with a relative.
"At the first stage in this case, the inquiry should not have been whether it was in the best interest of the child to place him with [D.A.] or with the foster parents. Instead, the inquiry should have been: whether the grounds for termination, stated in § 26-18-7, had been proved and, if so, whether there was an alternative to termination, such as placing the child with [D.A.]. In T.S. v. J.P., 674 So.2d 535, 538 (Ala.Civ.App.1995), this court held that `best interests' is not the correct inquiry at the first stage of a termination case. Writing for the court, Judge Thigpen explained:
"`The mother persuasively argues that the trial court erred in terminating her parental rights without following the applicable provisions of the CPA [Child Protection Act], specifically § 26-18-7, in that it used an improper standard. While the best interest of the child is always a paramount concern in such cases, the trial court erred in applying the `best interest' standard to the question regarding the termination of the mother's parental rights. The termination of parental rights standard provided by the CPA, and the case law interpreting the CPA, should have been applied. Accordingly, the judgment must be reversed and the cause remanded for the trial court to apply the proper standard to reach a decision.'
"674 So.2d at 538 (emphasis added).

*712 "The child's `best interests' come into play only after a decision to terminate parental rights has been made. Thus, the trial court, before it considered the merits of allowing the [child to remain with the foster parents], should have determined whether giving [D.A.] custody of the child was a viable alternative to terminating the father's rights.
"I would reverse the trial court's judgment because ... I think placement with [D.A.] was a viable alternative to termination of [G.L.C.'s] parental rights.
"`Inasmuch as the termination of parental rights strikes at the very heart of the family unit, a court should terminate parental rights only in the most egregious of circumstances.'
"Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). The circumstances of this case do not present that degree of egregiousness."
S.W. v. Walker County Dep't of Human Resources, 709 So.2d at 1271-72.