961 So.2d 839 (2007)
J.L.
v.
STATE DEPARTMENT OF HUMAN RESOURCES.
No. 2050681.
Court of Civil Appeals of Alabama.
January 12, 2007.
*841 Elizabeth A. Halbrooks, Athens, for appellant.
Troy King, atty. gen., and Sharon E. Ficquette and Elizabeth Hendrix, asst. attys. gen., Department of Human Resources, for appellee.
PER CURIAM.
J.L. appeals from a judgment of the trial court terminating his parental rights to his daughter, D.T. ("the child"). We affirm.
J.L. ("the father") was adjudicated to be the father of the child on November 13, 2003, after DNA testing had been performed. On July 13, 2005, the State of Alabama, acting through the Limestone County Department of Human Resources ("DHR"), filed a petition to terminate the father's parental rights. DHR alleged, among others things, that the father had abandoned the child, that the father was incarcerated out of state for a felony offense, and that no reasonable alternatives to termination existed. The parental rights of the child's mother ("the mother") had been previously terminated by the trial court on July 12, 2004.
On December 9, 2005, the trial court held a hearing at which the father entered a stipulation that the child was dependent. Subsequently, on the same day, the trial court issued an order declaring the child to be dependent, pursuant to § 12-15-1(10), Ala.Code 1975. On April 6, 2006, the trial court held a termination hearing at which it heard ore tenus evidence. On May 1, 2006, the trial court issued a judgment terminating the father's parental rights.
After the trial court entered its judgment, the father timely appealed to this court. The relevant facts are as follows.
At the termination hearing, the father testified that the child was born on March 8, 1999, and that he and the mother had lived together off and on after the child was born until April 2002. The father explained that when he and the mother were living together, both provided care for the child. However, during the short periods when the father and mother were separated, the mother provided the primary care for the child with the father providing monetary support. The paternal grandfather of the child ("the grandfather") and his wife ("the stepgrandmother") both testified that the father had a good relationship with the child before the father was incarcerated and that they never observed the father act inappropriately with the child.
The father testified that in 2001 and 2002 he was convicted of three separate felony charges, specifically theft, automobile theft, and burglary. The father committed *842 these felonies in three separate states, Maryland, Tennessee, and Alabama. The father stated that the last time he spent any significant time with the child was in April 2002, shortly before he was incarcerated. After the father was convicted of the three crimes, he was incarcerated for approximately three and a half to four years. The father testified that he first spent close to three years in prison in Maryland; that he was then transferred to Tennessee, where he spent approximately one year in prison; and that after the year in Tennessee, he spent one month in an Alabama prison. The father was released from prison in December 2005. The father stated that he is currently serving portions of several probation terms: a four-year term of supervised probation from Tennessee, a three-year term of supervised probation from Maryland, and a two-year unsupervised term from Alabama.
Tracy Sherrill, the child's DHR caseworker, testified that the child first came into the care of DHR in June 2002. DHR received reports of neglect regarding the child and the child's half brother ("the brother")[1] that DHR investigated but did not confirm. However, DHR did discover that the mother was using illegal drugs and had no income and that there was no food in the mother's home. Additionally, DHR noticed that the child was acting out sexually. Sherrill testified that, at some point during DHR's investigation, the mother placed the child and her brother with an acquaintance and moved to Tennessee. Because both children were living in Alabama without a legal guardian, DHR placed the children under DHR care in a foster home, where they remained at the time of the termination hearing. Sherrill stated that the mother's parental rights to the brother had been terminated and that the foster family had adopted the brother a little more than a year before the termination hearing. The foster family also wants to adopt the child.
Sherrill testified that DHR initially attempted to place the child with relatives of both the mother and the father. Inquiries and home studies conducted on the mother's family revealed that no one in her family was a willing and suitable placement for the child. Once the paternity of the father was established, DHR also inquired into the paternal grandfather and stepgrandmother (hereinafter collectively "the grandparents") of the child as a possible placement for the child. Initially, DHR allowed the grandparents periodic visits with the child over a period of about five or six months starting in late 2002 and ending in 2003. However, Sherrill testified that when DHR asked the grandparents whether they were interested in having a home study done to investigate the possibility of their taking custody of the child, they stated that they were not interested and felt that the child needed to be in foster care. Although the grandparents both testified that they had told DHR that they were not interested in adopting the child, they both claimed that DHR had never asked them about performing a home study and that they would have been willing to take temporary custody of the child until the father was able to support the child himself. After the child was placed in foster care and paternity was *843 established, Sherrill began to write the father in prison concerning the child's status. Sherrill recalled that she wrote a letter to the father approximately every three months to keep the father apprised of major events. Sherrill stated that the father typically wrote back promptly and expressed interest in the child's welfare. During the father's time in prison, he never contacted the child directly, nor did he instruct DHR or anyone else to communicate on his behalf with the child. The father explained that he wanted to contact the child but did not know what to say to her. The father testified that for Christmas 2003 he sent the child a baseball glove as a present via his parents. Sherrill also testified that the father contacted her shortly before his release from prison inquiring about visitation with the child; however, at that time DHR had already filed a petition for termination of the father's parental rights. At the time of the hearing, the father had only seen the child once since the time he was incarcerated, namely when he went for DNA testing.
The father testified that after his release from prison he moved in with his father and stepmother in Elkmont. The father stated that he obtained a job in Huntsville as a construction worker within a week of his release, and he still had the same job at the time of the termination hearing. At the time of the termination hearing, the father was working 40 hours per week and was earning $8.50 per hour with $0.50 per hour raises every 90 days. The father has stayed with the grandparents on the weekends and with his brother in Huntsville during the week while working at his job. The father stated that he had been staying with his brother during the week because he did not have a driver's license and needed help with transportation to his job. On the day of the termination hearing, the father obtained a driver's license. The father has no permanent housing of his own.
Both the father and the grandparents testified that the father has matured significantly since being incarcerated and has developed into a responsible individual. The father testified that before his release from prison he obtained a high-school-equivalency diploma in Maryland. The father testified that he has never had a drug or alcohol problem. The father also stated that he has not missed any of his scheduled probation calls or meetings since he was released and has made all restitution payments on time as required under his felony sentences. The paternal grandfather testified that he has not seen the father intoxicated on alcohol or illegal drugs and that he has not seen the father fighting or acting angry or "out of control" since the father's release. The paternal grandfather also testified that the father has been able to provide for his own financial needs. However, the father paid no support for the child to the foster parents in the five months between his release and the termination hearing. Also the father has not contacted the child since his release from prison.
Sherrill testified that when the father was in jail DHR was unable to set up an Individualized Service Plan ("ISP") for potential placement of the child with the father because of his imprisonment. Sherrill also testified that the typical DHR policy for children placed under DHR care was to find a permanent-custody solution within 12 months of DHR's taking over a child's care. By June 2003, the child had already been in DHR's care for 12 months. DHR's plan was to have the child adopted. The foster family with which DHR had initially placed the child and her brother had already adopted the brother, and the foster family wanted to adopt the child as well. Sherrill explained that DHR waited *844 until July 13, 2005, to file the petition to terminate the father's parental rights because, she stated, the father had to be present at the termination hearing. DHR had no way of securing the father's presence at a hearing because of his incarceration in Maryland.[2] Sherrill further stated that because DHR had filed its petition for termination before the father was released from prison, DHR did not attempt to set up any ISP meetings, family-counseling sessions, or parenting classes with the father.
At the hearing, the attorney for DHR asked the father what he thought would be in the best interest of the child. The father responded by saying that he would consent to the termination of his parental rights if he could obtain some visitation with the child and "be in her life." The father explained that he has been a "deadbeat dad" and feels that his child should be in a stable environment. He recognized that the child and her brother have been in a stable environment by being in the same foster home for four years. The father stated that he is grateful to the foster mother and thinks that she is doing a good job caring for the child. Additionally, the father stated that he did not want to "yank" the child out of the foster home and that his only opposition to adoption by the foster family was the possibility of not having any visitation rights with the child.
In its May 1, 2006, order, the trial court stated:
"The Court finds from clear and convincing evidence, competent, material and relevant in nature that [the father] is unable or unwilling to discharge his responsibilities to and for [the child] and his conduct or condition is such as to render him unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future.
"In determining that [the father] is unable or unwilling to discharge his responsibility to and for the child, the Court has considered the following:
"1. [The father] has periodically abandoned his child. There has been a voluntary and intentional relinquishment of the custody of the child by her father, or a withholding from the child, without good cause or excuse, by the father, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or a failure to perform the duties of a parent. His choices and actions have resulted in incarceration so that his child was abandoned. [The father] last saw his daughter at court-ordered DNA testing on September 4, 2003. Prior to that brief contact, he last saw his child [in] April 2002.
". . . .
"4. [The father] has been convicted and imprisoned on felony charges. Since the inception of the dependency petition in 2002, he has been imprisoned *845 the majority of the time. During the pendency of the case he has been incarcerated in Alabama, Tennessee and Maryland. He was convicted of burglary in Maryland, automobile burglary in Tennessee and theft in Alabama. Prior to [the child's] birth he was also convicted of theft in Alabama. [The father's] probation in Alabama has been extended until December 2007.
". . . .
"6. Reasonable efforts by the Department of Human Resources leading toward the rehabilitation of [the father] have failed. DHR filed the dependency petition in this case on June 19, 2002, (JU-2002-137.01). Since that time, [the father] has been incarcerated somewhere so that rehabilitation could not take place. He was in prison when [the child] was placed in foster care and remained incarcerated until December 2005. By that time, this petition to terminate parental rights had been filed. He attended no individualized service plan (ISP) meetings since he was incarcerated.
". . . .
"The Court also considered the following:
"1. [The father] has failed to provide for the material needs of [the child] or to pay a reasonable portion of her support where he is able to do so. By his own actions, [the father] was incarcerated so that he could not support his child. He testified that he began working within one week of his release in December 2005 but no support payments have been made for his child.
"2. [The father] has failed to maintain regular visits with [the child] in accordance with a plan devised by DHR and agreed to by him. [The father] was incarcerated so that he could not visit with his daughter. Immediately upon his release, he sought legal counsel to petition the court for visitation.
3. [The father] has not had contact with the child for over two years. His last contact with [the child] was on September 4, 2003, at the courthouse where they were submitting to DNA paternity testing. Prior to that brief contact, he last saw his child in April 2002.
"4. There has been no real effort by [the father] to adjust his circumstances to meet the needs of his child. He continued to adopt a lifestyle resulting in incarceration that does not include parenting his child. This child had to wait for him to be released from incarceration in the State of Maryland so that the final hearing on this petition could occur since there was no legal mechanism to secure his appearance in Alabama for this civil action while he was incarcerated in Maryland on criminal charges. She deserves a permanent home and a chance for adoption.
"The Court further finds that there are no viable alternatives to termination of the parental rights of the father. Family resources did not want to be considered for adoptive placement earlier in the case when DHR sought family resources. While he was incarcerated, [the father] corresponded with his child's social worker, and his family visited at first with [the child]. He now wants visitation and `to be in her life.' While [the father] is trying to begin a new life, by his own testimony he is not ready to assume custody and control of his child.
The Court finds that it is not in the best interest of the child to wait longer to see if her father can take care of her. He testified that he wished there was a way to let her be adopted but maintain visitation with his child. He acknowledged that this was `about his daughter but not *846 about me' and expressed that he did not want her separated from her brother. She has lived most of her life with her foster family and her brother has been adopted by them. [The child] has been in the foster home . . . since the case began and [the foster family wants] to adopt her.
"For the foregoing reasons, it is, therefore, ORDERED, ADJUDGED, and DECREED that it is in the best interest of the child that the parental rights of [the father] are terminated as to the minor child. . . .
"It is FURTHER ORDERED that the permanent legal and physical custody of [the child] is placed with the Alabama Department of Human Resources for adoptive placement."
On appeal, the father argues that the trial court had insufficient evidence on which to base a termination of his parental rights and that viable alternatives to termination existed. We disagree.
A trial court's determination of factual issues following the presentation of ore tenus evidence is presumed correct and will not be disturbed on appeal absent a showing of palpable error. F.L.L. v. State Dep't of Human Res., 612 So.2d 501 (Ala.Civ.App.1992). Section 26-18-7, Ala. Code 1975, sets forth the statutory authority for the termination of a parent's parental rights, providing, in pertinent part:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
". . . .

*847 "(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
(Emphasis added.)
"A parent has a prima facie right to custody of his or her child and this right can be overcome only by clear and convincing evidence that the child's best interests would be served by permanently terminating the parent's custody." Ex parte State Dep't of Human Res., 624 So.2d 589, 591 (Ala.1993)(citing R.C.M. v. State Dep't of Human Res., 601 So.2d 100 (Ala.Civ.App. 1991)). When the State is petitioning to terminate a parent's parental rights, the trial court must first determine if the child is dependant and then must examine whether all viable alternatives to termination have been considered. Ex parte Beasley, 564 So.2d 950 (Ala.1990). On appeal, the trial court's determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to by plainly and palpably wrong. Ex parte State Dep't of Human Res., supra.
The father first argues that the trial court erred in finding that he had abandoned the child, under § 26-18-7(a)(1), because, he says, he did not "voluntarily relinquish" custody of the child. However, as this court has explained, "voluntary relinquishment is not the equivalent of abandonment." K.C. v. D.C., 891 So.2d 346, 349 (Ala.Civ.App.2004). A finding of voluntary relinquishment means that the court need not, before removing a child from a parent's custody, find "`"misconduct or neglect to a degree which renders [the] parent an unfit and improper person to be entrusted with the care and upbringing of the child in question." '" 891 So.2d at 348-49 (quoting Ex parte Terry, 494 So.2d 628, 632 (Ala.1986), quoting in turn Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983)).
Abandonment, on the other hand, is a concept defined in § 26-18-3(1), Ala.Code 1975, which states:
"Abandonment. A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
(Emphasis added.)
It is evident from the text of § 26-18-3(1) that, although abandonment may be based on a finding of voluntary relinquishment, *848 voluntary relinquishment is only one of the grounds on which a court may find that a parent has abandoned a child.
The father cites D.P.M. v. D.B., 669 So.2d 191 (Ala.Civ.App.1995), in support of his argument that he did not voluntarily relinquish custody of or abandon the child. He claims that that case stands for the proposition that imprisonment does not constitute voluntary relinquishment of a child. However, the holding in D.P.M. v. D.B., supra, is not quite so broad. In D.P.M. v. D.B., supra, a mother was in prison when she gave birth to a child. Because she could not keep the child in prison, she arranged for a friend to care for the child. After several months, the friend took the child to the child's maternal grandmother for care. The mother also signed an agreement granting temporary custody of the child to the grandmother. Approximately 13 months after the child was born, the mother was released from prison. This court addressed whether under those circumstances the mother had voluntarily relinquished custody of her child, stating "[w]e disavow any language from [previous cases] that would mandate a finding that a parent facing imprisonment has `voluntarily relinquished' custody of his child when he arranges for another party to care for the child during the parent's imprisonment." D.P.M. v. D.B., 669 So.2d at 194 (emphasis added). Later in the opinion, this court made clear that the trial court could, on remand, make a finding of voluntary relinquishment, under the caution that the trial court "should take into account all of the mother's conduct toward the child." D.P.M. v. D.B., 669 So.2d at 195.
Therefore, contrary to the father's arguments, D.P.M. v. D.B., supra, and K.C. v. D.C., supra, do not prohibit a trial court from making a finding of voluntary relinquishment of custody under circumstances where the parent has been imprisoned. In K.C. v. D.C., supra, this court discussed the holding in D.P.M. v. D.B., supra, and affirmed a trial court's determination that the father in that case had voluntarily relinquished custody of the child to the child's grandparents. In that case, although he was not incarcerated, the father left the child in the care of its grandparents for four years; the grandparents presented evidence indicating that they had informed the father that they wanted to take care of the child permanently. This court concluded that
"a trial court facing the issue must determine whether the facts of the particular case support a conclusion that the parent voluntarily relinquished custody of the child or whether the parent's actions were instead `enlisting the aid' of another during necessitous times."
891 So.2d at 351.
We note that in this case the trial court had before it evidence on which it could have based a finding that the father had voluntarily relinquished custody of the child. After his imprisonment, the father made no effort to contact the child directly. Similarly, after he was released from prison and up until the time of the termination hearing, the father made no effort to see or otherwise contact the child, other than one or two telephone calls to DHR. These facts, combined with the fact that his own voluntary actions caused his term of imprisonment, strongly support the trial court's finding of voluntary relinquishment.
Regardless, even if the father was correct that he did not voluntarily relinquish custody of the child, the court still could have made a finding of abandonment under one of the other factors enumerated in § 26-18-3(1). As the record shows, there was clear and convincing evidence before *849 the trial court indicating that the father had abandoned the child.
Due to the father's own actions, he was incarcerated for almost four years. During that time he was unable to "perform the duties of a parent" and was unable to provide his "presence, care, love, protection, maintenance or . . . display . . . filial affection." § 26-18-3(1). Also, the father failed to pay any child support upon his release from prison. Under § 26-18-3(1), therefore, the trial court could have found that the father had abandoned the child. See W.L.H. v. B.L.M., 829 So.2d 173, 174 (Ala.Civ.App.2002)(holding that a mother had abandoned her child when she went to jail for five months and did not visit the child after her imprisonment). Contrary to the assertion in the dissent, we do not uphold the trial court's finding of abandonment based upon a conclusion that imprisonment for a felony constitutes abandonment per se. We agree with the dissent that imprisonment for a felony should not constitute per se abandonment. Rather, we base our holding on all the circumstances of the case, including the father's actions that led to his separation from the child for four years, his lack of effort to contact his child before or after his release from prison, and his failure to attempt to support the child after his release from prison.
The father next challenges the second factor relied on by the trial court, namely his "[c]onviction of and imprisonment for a felony," § 26-18-7(a)(4), by simply restating his argument that "incarceration alone does not mean that a parent has abandoned or relinquished the custody or relationship with the child." However, § 26-18-7(a)(4) has nothing to do with abandonment or voluntary relinquishment of custody; rather, § 26-18-7(a)(4) establishes conviction and imprisonment for a felony as a separate ground for termination that stands on its own. See K.W. v. State Dep't of Human Res., 656 So.2d 849, 851 (Ala.Civ.App.1995)("Alabama law provides that a parent's felony conviction is a factor that the trial court can consider in concluding that the father is not a viable choice for the children's custody."). The father does not dispute that he was, in fact, convicted of three separate felonies and imprisoned on those crimes. Therefore, the juvenile court could rely on those felony convictions as a factor for terminating the father's parental rights.[3]
The father next argues that DHR did not pursue reasonable efforts to rehabilitate him. In most cases, "DHR has the duty to make reasonable efforts to rehabilitate the [parent] so that family reunification might be attainable." C.B. v. State Dep't of Human Res., 782 So.2d 781, 785 (Ala.Civ.App.1998). However, as *850 § 12-15-65(m)(1), Ala.Code 1975, provides, DHR need not make reasonable efforts for rehabilitation under certain circumstances, including when the parent has "[s]ubjected the child to an aggravated circumstance, including, but not limited to, abandonment. . . ." Here, the trial court determined that the father had abandoned the child, which is one of the "aggravated circumstances" listed in § 12-15-65(m)(1).
Also, the father has simply been unavailable for rehabilitation for almost four years. Though DHR should attempt rehabilitation when reasonable, the father cites no case indicating that DHR must still attempt rehabilitation in a case such as this, where the father has been in prison for four years and the child has been in foster care during that time. Therefore, DHR was not required to pursue rehabilitation of the father before seeking termination of his parental rights in the child.
To reiterate, the father was convicted of and imprisoned for multiple felonies. The trial court also found that the father had abandoned the child. It is undisputed that the father has neither written to nor had any other contact with the child since early 2002, other than when he saw her briefly at the DNA testing procedure. The child has been in a stable environment since shortly after the father was incarcerated and is living with a family that has already adopted her brother and wishes to adopt her as well. Even the father testified that he has not been a responsible father, characterizing himself as a "deadbeat dad." The father also testified that it would not be in the child's best interests to "yank" her out of her current home and expressed that he was in favor of her adoption. In view of these facts, we cannot hold that the trial court erred in finding that clear and convincing evidence supported termination of the father's parental rights.
The dissent places significant emphasis on the timing of DHR's petition, claiming that the current circumstances of the parent no longer warrant termination of his parental rights. The dissent also cites the recent case of Ex parte T.V., [Ms. 1050365, December 15, 2006] ___ So.2d ___, ___ (Ala.2006), in support of its argument that the father's current circumstances do not warrant termination of his parental rights. However, the facts supporting the parent in Ex parte T.V., supra, are much more compelling than those supporting the father in this case. In Ex parte T.V., the supreme court reversed this court's affirmance of the trial court's judgment terminating the parental rights of T.V. in her child, N.V. ___ So.2d at ___. There, DHR petitioned for and obtained a determination of dependency for the child shortly after the child's birth in June 1999, because the mother was addicted to drugs, homeless, unemployed, and incarcerated facing criminal charges. However, by March 2004, when DHR filed its petition for termination of T.V.'s parental rights, the mother had made what our supreme court found to be significant progress and had "met the goals DHR originally set for her" as part of an ISP. Ex parte T.V., ___ So.2d at ___. In short, T.V. was no longer homeless, had married the father of the child, had been both drug-free and regularly employed since July 2002, and had contributed to the support of her child.
In contrast, the father has not demonstrated the same level of progress as T.V. At the time of the hearing, he had only been out of jail and employed for approximately five months, as opposed to the two years that T.V. had been regularly employed. Additionally, at the time of the hearing, the father had no home of his own and was living with relatives.
Also, we would emphasize that "[i]t is the consideration for the best interests of *851 the child that lies at the heart of every proceeding to terminate parental rights." H.M.W. v. Mobile County Dep't of Human Res., 631 So.2d 1049, 1050 (Ala.Civ.App.1993)(emphasis added). We find that the relevant current circumstances as they relate to the child are this: that the child has been in a stable foster home for four years and that her foster parents wish to adopt her; that the father has been out of the child's life during this time due to the consequences of his own voluntary actions; that placing the child with the father, by his own admission, would not be in the child's best interest; and that the father has made no attempt to provide support for the child. To hold that, under these facts, the father's parental rights should not be terminated simply because DHR waited to file its petition until shortly before the father was released from prison places too much emphasis on the parent and does not adequately account for the best interests of the child.
The father also argues that the court erred in holding that there were no viable alternatives to termination of his parental rights. The father relies principally on the fact that the grandparents testified that they were not offered a home study by DHR and that they would have been willing to keep the child temporarily. However, Sherrill, the DHR caseworker, contradicted the testimony of the grandparents, stating that DHR did offer the grandparents a home study and that they refused. "`When a trial court hears disputed ore tenus evidence, its judgment based on that evidence will not be set aside unless it is so contrary to the evidence as to be plainly and palpably wrong.'" G.L.C. v. State Dep't of Human Res., 777 So.2d 706, 709 (Ala.Civ.App.1999)(quoting D.G. v. Calhoun County Dep't of Human Res., 680 So.2d 359, 360 (Ala.Civ.App. 1996)). In view of the conflicting testimony on this issue, the trial court's conclusion that no viable alternatives to termination existed was not error.
Accordingly, we affirm the judgment of the trial court.
AFFIRMED.
THOMPSON, PITTMAN, and BRYAN, JJ., concur.
MURDOCK, J., concurs in the result, without writing.
CRAWLEY, P.J., dissents, with writing.
CRAWLEY, Presiding Judge, dissenting.
The judgment of the Limestone Juvenile Court should be reversed because DHR failed to prove grounds for terminating the father's parental rights. The juvenile court relied on three statutory grounds: that the father had abandoned the child, § 26-18-7(a)(1), Ala.Code 1975; that the father had been convicted of and imprisoned for a felony, § 26-18-7(a)(4), Ala. Code 1975; and that reasonable efforts by DHR to rehabilitate the father had failed, § 26-18-7(a)(6), Ala.Code 1975. None of the three grounds were proved at the termination hearing.

Conviction of and Imprisonment for a Felony  § 26-18-7(a)(4)
DHR determined that it had to await the father's imminent release from prison in order to petition for the termination of his parental rights because, it thought, the father had to be present at the hearing on the petition. That determination was erroneous. Due process does not require that an incarcerated parent be allowed to attend the hearing on the petition to terminate his or her parental rights when the parent is represented by counsel and has the opportunity to present his testimony by deposition. See Pignolet v. State Dep't *852 of Pensions & Sec., 489 So.2d 588, 590-91 (Ala.Civ.App.1986).
Having made the decision to wait for the father's imminent release from prison, however, DHR became bound by the legal consequences of that decision  that is, DHR was required to prove that the grounds for termination currently existed. See Ex parte T.V., [Ms. 1050365, December 15, 2006] ___ So.2d ___, ___ n. 6 (Ala.2006)(concluding that it was immaterial that if DHR had moved to terminate the mother's parental rights earlier, DHR could have sustained its burden to prove by clear and convincing evidence that there was no viable alternative to terminating the mother's rights, and stating that "[t]he matter before us is whether there is, at this time, clear and convincing evidence of the absence of any other viable alternative to the termination of [the parent's] parental rights")(emphasis added).
"`This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.'"
P.H. v. Madison County Dep't of Human Res., 937 So.2d 525, 531 (Ala.Civ.App.2006)(quoting D.O. v. Calhoun County Dep't of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003)). Because the termination hearing did not occur until the father had been released from prison, DHR was required to establish grounds for termination other than the ground stated in § 26-18-7(a)(4), Ala.Code 1975. The father's current circumstances did not include imprisonment for a felony.
The rationale for including "[c]onviction of and imprisonment for a felony," pursuant to § 26-18-7(a)(4), as a ground for termination is that a parent's incarcerated status suffices, in and of itself, as a basis for determining that the parent is unable to perform his parental duties and to provide his or her child with a normal home. See generally Gregory D. Sarno, Annot., Parent's Involuntary Confinement, or Failure to Care for Child as Result Thereof, as Evincing Neglect, Unfitness, or the Like in Dependency or Divestiture Proceeding, 79 A.L.R.3d 417, § 7 (1977). That rationale is inoperative when, as in the present case, the parent is no longer incarcerated at the time the merits of the petition are being considered.
The main opinion cites K.W. v. State Department of Human Resources, 656 So.2d 849 (Ala.Civ.App.1995), for the proposition that conviction of and imprisonment for a felony is a ground for termination pursuant to § 26-18-7(a)(4). In K.W., however, like the majority of the other decisions relying on § 26-18-7(a)(4) as a ground for termination of parental rights, the parent was incarcerated at the time of the hearing on the petition. See T.B. v. Lauderdale County Dep't of Human Res., 920 So.2d 565 (Ala.Civ.App.2005) (both parents were incarcerated at the time of the hearing); Valero v. State Dep't of Human Res., 511 So.2d 200 (Ala.Civ.App. 1987)(same); J.A.H. v. Calhoun County Dep't of Human Res., 865 So.2d 1228 (Ala. Civ.App.2003)(the father was incarcerated at the time of the hearing); G.L.C. v. State Dep't of Human Res., 777 So.2d 706 (Ala. Civ.App.1999)(same); K.W. v. State Dep't of Human Res., 656 So.2d 849 (Ala.Civ. App.1995)(same); A.N.S. v. K.C., 628 So.2d 734 (Ala.Civ.App.1993)(same); Carter v. Griffin, 574 So.2d 800 (Ala.Civ.App. 1990)(same); Petersen v. State Dep't of Human Res., 550 So.2d 1032 (Ala.Civ.App. 1989)(same); In re Gunn, 467 So.2d 963 (Ala.Civ.App.1985)(same); M.H. v. E.F.E., 630 So.2d 452 (Ala.Civ.App.1992)(the mother was incarcerated at the time of the *853 hearing); and Rose v. Spencer, 491 So.2d 257 (Ala.Civ.App.1986)(same).
This court has sanctioned the use of the § 26-18-7(a)(4) ground for termination, even if the parent was not incarcerated at the time of the hearing on the petition, when the felony offense for which the parent had been previously convicted and imprisoned bore strongly on the parent's unfitness to care for his or her child. See D.D. v. State Dep't of Human Res., 628 So.2d 718 (Ala.Civ.App.1993) (affirming the termination of a mother's parental rights when the mother had been previously convicted and imprisoned for seven years for attempted second-degree murder of another child); Travis v. State Dep't of Human Res., 547 So.2d 571 (Ala.Civ.App.1989) (affirming the termination of a mother's parental rights when the mother had been convicted and imprisoned for two prior felonies and her conviction for a third felony  child abuse involving third-degree burns over 50% of her child's body  was on appeal at the time of the hearing); and Varnadore v. State Dep't of Human Res., 543 So.2d 1194 (Ala.Civ.App.1989)(affirming termination of a mother's parental rights based on her previous conviction and sentence to eight years' imprisonment for felony child abuse involving the death of her 3 1/2-month-old son whose injuries included 17 rib fractures and 15 human bite marks). Compare the 1998 amendment to § 26-18-7, Ala.Code 1975, adding subsections (7)a., -b., and -c. (allowing the court to consider, among other things, a parent's conviction for murder, manslaughter, felony assault, or abuse of another child of the parent).
This court has decided three parental-rights-termination cases in which it mentioned the § 26-18-7(a)(4) ground for termination despite the fact that the parent was not incarcerated at the time of the hearing on the petition and despite the fact that the parent's previous offense was not a felony involving child abuse. See State Dep't of Human Res. v. A.K., 851 So.2d 1 (Ala.Civ.App.2002); D.S.S. v. Clay County Dep't of Human Res., 755 So.2d 584 (Ala. Civ.App.1999); and Burroughs v. State Dep't of Human Res., 516 So.2d 676, 678 (Ala.Civ.App.1987). None of those cases is authority for affirming the juvenile court's judgment.
In A.K., while the father was imprisoned, DHR petitioned to terminate both parents' rights to their three children. As in the instant case, the father in A.K. had been released from prison four months before the hearing on the petition. Within two months of his release, the father in A.K. had tested positive for the use of illegal drugs. The mother had recurrent drug-abuse problems. The trial court entered no findings of fact or conclusions of law with respect to the father's conviction and imprisonment for a felony, denied DHR's petition, and ordered that the children be transferred to a group home. This court reversed, holding that the trial court had erred in failing to terminate the parents' rights, but this court declined to state the grounds upon which a termination of the father's rights would be appropriate. A.K., therefore, is not authority for the proposition that a parent's prior conviction and completed term of imprisonment for a felony constitutes grounds for termination of his parental rights.
In D.S.S., the trial court did not rely on § 26-18-7(a)(4) as a ground for terminating the mother's parental rights, and this court's noting that the trial court might have considered "the effect on the children of the mother's `[c]onviction and imprisonment for a felony,'" 755 So.2d at 586, was not necessary to the holding and, therefore, was dicta.
In Burroughs, the father was incarcerated at time of trial. The mother was incarcerated *854 for much of the time the child had been in foster care, and, when the mother was released from prison, she "exhibited no interest in establishing a home for [the child] or in procuring employment so as to support and provide for the child." 516 So.2d at 678. In contrast, the evidence in the instant case indicated that before his incarceration the father had a good relationship with the child; that during his incarceration he corresponded with the child's caseworker, expressed interest in the child, and sent her a Christmas gift; and that immediately after his release from incarceration, the father procured gainful employment, requested but was denied permission by DHR to visit his child, and contacted an attorney to petition the court for visitation.

Abandonment  § 26-18-7(a)(1)
"Abandonment" is defined in § 26-18-3(1), Ala.Code 1975, as:
"A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
The father's argument that D.P.M. v. D.B., 669 So.2d 191 (Ala.Civ.App.1995), holds that imprisonment per se 38 simply cannot constitute "voluntary relinquishment of the custody of a child" is absolutely correct. As we explained in D.P.M., 669 So.2d at 194, a parent has no right to retain custody of a child in prison, and, as our supreme court explained in Ex parte D.J., 645 So.2d 303, 307 (Ala.1994), one "cannot . . . relinquish a right that does not exist."
The statement in the main opinion that, in D.P.M., this court "made clear that the trial court could, on remand, make a finding of voluntary relinquishment, under the caution that the trial court `should take into account all of the mother's conduct toward the child,'" 961 So.2d at 848, obviously applied only to the mother's pre-incarceration and post-release conduct toward the child and not to her incarceration per se.
I do not believe that a parent's imprisonment may constitute the abandonment of his or her child within the meaning of § 26-18-3(1). I base that belief, first, on the wording of § 26-18-3(1) itself, and, second, on the statutory redundancy that would result in § 26-18-7 if a parent's imprisonment per se constituted an abandonment of his or her child. The wording of § 26-18-3(1) indicates that an abandonment will be deemed to have occurred only when a parent withholds from his or her child any of the qualities enumerated in the statute ("his presence, care, love, protection, maintenance or the opportunity for the display of filial affection") "without good cause or excuse." Unless a parent's imprisonment is a "good cause or excuse" for the "withholdings" and the "failures" enumerated in § 26-18-3(1), then incarceration will necessarily constitute abandonment.
In Gillespie v. Bailey, 397 So.2d 130, 132 (Ala.Civ.App.1980), this court stated that it was "not to be understood as holding that incarceration per se constitutes abandonment." However, following the logic of the main opinion would result in holding exactly that: that incarceration per se constitutes abandonment. Unless the phrase "without good cause or excuse" is read into all the provisions of the statute defining "abandonment," every incarcerated parent can be deemed to have abandoned his child and the conviction-and-imprisonment-for-a-felony ground for termination becomes redundant because it is already covered by *855 the abandonment ground. The main opinion recognizes this dilemma when it states that "§ 26-18-7(a)(4) [`[c]onviction and imprisonment for a felony'] has nothing to do with abandonment or voluntary relinquishment of custody; rather, § 26-18-7(4) establishes conviction and imprisonment for a felony as a separate ground for termination that stands on its own." 961 So.2d at 849.

"Reasonable Efforts"  § 26-18-7(a)(6)
The main opinion holds that DHR was not required to make reasonable efforts to rehabilitate the father in order to reunite him with his child for two reasons, namely: (1) because "reasonable efforts" are not required when a parent has abandoned his child, see § 12-15-65(m)(1) and § 26-18-7(a)(1); and (2) because the father has been unavailable for rehabilitation for four years. The reasoning of the main opinion would make only one factual finding really necessary in this case  that the father has been imprisoned during four years of the child's life  because from that finding two conclusions, according to the logic of the main opinion, naturally follow: first, that attempted rehabilitation is not required because the father abandoned his child (by being in prison for four years); and second, that the father was unavailable for rehabilitation (because he was in prison for four years).
I have already set out my reasons for disagreeing with the reasoning underlying the conclusion that the father abandoned his child by being imprisoned. I will add only that DHR, having decided to postpone filing its petition to terminate the father's parental rights until his impending release from prison, must now accept the legal consequences of that decision, namely: it must make reasonable efforts to reunite the father with his child because his current circumstances make him available for rehabilitation. See Ex parte T.V., supra. The statutory ground for termination outlined at § 26-18-7(6) is that "reasonable efforts by [DHR] . . . leading toward the rehabilitation of the parent[ ] have failed." (Emphasis added.) This ground was not proved. Instead, the evidence established without dispute that reasonable efforts were never undertaken. Because DHR failed to prove the grounds for termination, the father's testimony in response to the petition need not be addressed.
NOTES
[1] It is not clear from the record whether the child's brother is a full or half brother. It is undisputed that the child and the brother have the same mother. However, the brother's paternity is not clear. Though the father testified at the termination hearing that he thought the brother might be his child, Sherrill testified that J.L. was not the father of the brother. Also, J.L. was never adjudicated to be the brother's father, and the brother has been adopted.
[2] We note that DHR appears to have been operating under the mistaken assumption that it could not proceed with termination proceedings unless the father could attend the termination hearing. As this court has explained, "[a]s regards the termination of the parental rights of incarcerated parents, where they receive notice of the petition and hearing, are represented by counsel at the hearing, and the trial court grants them an opportunity to present testimony by deposition, . . . there is no violation of their due process rights." Sanders v. Kunkle, 533 So.2d 259, 260 (Ala.Civ.App.1988). See also Thornton v. Thornton, 519 So.2d 960, 961 (Ala.Civ.App. 1987); Valero v. State Dep't of Human Res., 511 So.2d 200, 202-03 (Ala.Civ.App.1987); and Pignolet v. State Dep't of Pensions and Sec., 489 So.2d 588, 591 (Ala.Civ.App.1986).
[3] The dissent would seem to hold that, unless a parent is currently imprisoned at the time of a termination hearing or has been convicted of and imprisoned on a felony that "bore strongly on the parent's unfitness to care for his or her child," 961 So.2d at 853, such as abuse or murder of another child, a trial court cannot rely on § 26-18-7(a)(4) as a ground for termination of parental rights. Put another way, if a parent has been released from prison after serving time for any felony other than those involving harm to children, a trial court may not use that felony as a ground for terminating parental rights.

We note initially, however, that at the time DHR filed its petition the father was still in prison. Additionally, the plain language of § 26-18-7(a)(4) does not prevent a trial court from considering felonies for which a parent has already completed a prison term; the statute states that a trial court should consider as a factor a parent's "[c]onviction of and imprisonment for a felony." § 26-18-7(a)(4). The statute contains no language limiting the felonies a trial court should consider only to those for which the parent is currently incarcerated.